**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              **Plaintiff,**<br><br>                    **v.**<br><br>MELVILLE PETER TEN CATE,<br><br>                              **Defendant.** | **22-cv-2787**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") files this Complaint against Melville Peter ten Cate and alleges as follows:

**<u>SUMMARY</u>**

1.      Melville Peter ten Cate ("ten Cate" or "Defendant") and his now defunct private company Xcalibur Aerospace, Ltd. ("Xcalibur") knowingly or recklessly made a false and financially unviable tender offer for Textron, Inc. ("Textron"), a New York Stock Exchange-listed aircraft, defense and industrial company with a market capitalization of more than $10 billion.  Ten Cate was the sole principal and officer of Xcalibur, which purported to be a United Kingdom-based "aerospace and defence company specializing in the development and manufacturing of high speed unmanned aircraft systems."  As ten Cate knew or was reckless in not knowing, Xcalibur had negligible, if any, assets, operations and revenue, and was never positioned to make any legitimate offer for Textron.

2.      Notwithstanding this reality, on Monday, November 9, 2020, ten Cate placed a New York Times advertisement announcing Xcalibur's offer, set to expire on December 11, 2020, to purchase all outstanding shares of Textron common stock for $60.50, an approximately 56%

premium over the stock's previous closing price. The transaction would have required more than $14 billion to complete. Ten Cate falsely stated in the advertisement that Xcalibur had secured $11 billion in financing to complete the offer. Ten Cate also directed a similar announcement to appear on Xcalibur's public website.

3.      The November 2020 public announcement followed Defendant's previous non-public overtures to acquire Textron. Ten Cate first approached Textron via email on January 4, 2019, attaching a purported tender offer by Xcalibur to purchase Textron's outstanding common stock for $66 per share. Following a brief exchange, ten Cate provided what purported to be Xcalibur's financial statements to Textron. At the time, Textron's CEO sent an email to ten Cate stating that Textron was not interested in pursuing Xcalibur's offer. A little over a year later, on February 28, 2020, ten Cate sent another email to Textron's CEO, again with Xcalibur's purported financial information, stating that he was authorized to "suggest a cash transaction at $60 per share." Textron did not respond to the offer.

4.      The November 2020 tender offer announcement was materially false and misleading because, among other things, it failed to disclose that ten Cate and Xcalibur were incapable of completing the tender offer as they lacked the financial means to do so, that ten Cate and entities he controlled had been the subject of multiple bankruptcy and default judgments, and that Textron had previously rejected Xcalibur's offers to acquire or merge with Textron. Ten Cate knew or was reckless in not knowing each of these facts.

5.      After the announcement of Xcalibur's fraudulent tender offer, Textron's common stock price rose approximately 15% before market close on November 9. Its trading volume was approximately 450% higher than during the prior trading day, causing the New York Stock Exchange ("NYSE") to halt trading in Textron's shares.

6.      By engaging in the conduct described in this Complaint, Defendant violated, and

2

unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 [17 C.F.R. § 240.14e-8] thereunder.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such acts, practices, and courses of business; obtain a civil money penalty; prohibit ten Cate from acting as an officer or director of any public company; and such other and further relief as the Court may deem just and appropriate.

8.      This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

9.      Defendant directed his conduct to United States investors, including by publicizing the false tender offer through an advertisement that he arranged to appear in The New York Times. As a result, Defendant's false tender offer received publicity in the financial media in the United States.  Further, Defendant's false tender offer had a foreseeable and substantial effect in the United States, interrupting normal market forces and causing an artificial and substantial spike in both the price and trading volume of Textron shares on the NYSE.  Additionally, Defendant had numerous email communications with The New York Times to arrange publication of the advertisement containing the false tender offer.  Defendant also had numerous email communications with a service provider in New York that they engaged to provide technical assistance with a filing that would have been required in order for their false tender offer to be accessible to US investors via the SEC's Electronic Data Gathering and Retrieval ("EDGAR") system.  Ten Cate accessed the SEC's EDGAR system in an attempt to lodge the false tender offer. Although the SEC staff prevented the filing of the false tender offer, Defendant intended to utilize

a U.S. government platform to facilitate his fraud. Subsequent to the publication of the false tender offer via the advertisement in The New York Times, ten Cate gave an interview to SEC staff in which he made a number of false statements about Xcalibur's financing and supposed ability to complete the tender offer.

10.     In addition to the above contacts in the United States, ten Cate is a United States citizen, and communicated with at least one United States-based institutional investor concerning the false tender offer for Textron. Defendant had additional contacts in the United States in connection with his prior overtures for Textron, including his transmission of emails and financial data to Textron, and contact with the NYSE concerning a potential direct listing for Xcalibur.

11.     Venue in this District is proper because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within the Southern District of New York, including the announcement of the tender offer, in part, through an advertisement in the Manhattan-based New York Times and the engagement with a Manhattan-based service provider for technical services related to filing the tender offer in EDGAR.

## DEFENDANT

12.     **Melville Peter ten Cate** ("ten Cate"), age 52, is a United States citizen who resided in Europe during the relevant time period. Ten Cate was the sole principal and Chief Technology Officer of Xcalibur Aerospace, Ltd.

## OTHER RELEVANT ENTITIES

13.     **Xcalibur Aerospace, Ltd.** ("Xcalibur") was a purported United Kingdom-based aerospace defense company incorporated in May 2016. The company was a purported wholly-owned subsidiary of Xcalibur Aerospace LLC ("Xcalibur U.S."), a Delaware Corporation. Upon the petition of one of Xcalibur's creditors, the Business and Property Courts of England and Wales issued an order on July 7, 2021, to place Xcalibur in liquidation and wind up the company.

14.     **Xcalibur Aerospace LLC ("Xcalibur U.S.")**, the purported parent company of Xcalibur, was a Delaware limited liability company incorporated in 2016 but voided on June 1, 2019, for failure to pay taxes.  Xcalibur U.S. was created by an associate of ten Cate and former board member of Xcalibur.

15.     **Textron, Inc.** ("Textron") is a Delaware corporation, headquartered in Providence, Rhode Island.  Textron is a global aircraft, defense, and industrial company, with a market capitalization of more than $10 billion.  Textron's common stock trades on the NYSE under the ticker symbol "TXT."  At the time of Xcalibur's November 2020 tender offer announcement, Textron had approximately 229 million shares of common stock outstanding.

**FACTS**

**Background to the False Tender Offer**

16.     On January 4, 2019, ten Cate, sole principal and self-identified Chief Technology Officer of Xcalibur, sent an email to the Head of Investor Relations for Textron that included a letter addressed to Textron's CEO and a purported tender offer by Xcalibur to purchase Textron's outstanding common stock for $66 per share.  Textron requested documents to verify the legitimacy of the offer.  In response, ten Cate provided a number of documents to Textron concerning Xcalibur's purported financial condition, including documents stating that Xcalibur earned approximately £161 million in revenue for 2018, and that in January 2019, Xcalibur had received a $6.4 billion investment from a member of the Saudi Royal family.

17.     An investigation of ten Cate undertaken by Textron revealed a host of business failures, questionable commercial dealings, unpaid debts, and allegations of fraud, including attempts to deceive the governments of Iceland and Spain.  The investigation also revealed a number of personal and commercial bankruptcies involving ten Cate, as well as other lawsuits against ten Cate and companies he controlled, including:

- 2015 and 2017 U.K. bankruptcy orders against ten Cate;

- The bankruptcy and delisting of ten Cate's Icelandic operating company in 2015 and 2016;

- A 2007 Luxembourg bankruptcy judgment against Ten Cate Industries Holdings, SA, an entity controlled by ten Cate; and

- A 2008 U.S. District Court for the Eastern District of Virginia default judgment against ECA Program PLC, an entity controlled by ten Cate, in a suit alleging that ECA fraudulently received $1.66 million pursuant to a contract in which it had agreed to supply helicopters, flight crews, and maintenance staff to a Virginia corporation, but instead used the money to satisfy the bankruptcy judgment for Ten Cate Industries Holdings.

18.     Textron concluded that ten Cate and Xcalibur lacked credibility and could not feasibly have the financial means to pursue the proposed offer.  Accordingly, Textron's CEO informed ten Cate via email that Textron was not interested in pursuing Xcalibur's offer.

19.     On February 28, 2020, ten Cate again reached out to Textron's CEO via email, stating that he was authorized to "suggest a cash transaction at $60 per share."  Ten Cate provided Textron with Xcalibur's purported 2019 financial statements, which claimed that its revenue more than doubled to approximately £360 million and its assets increased to approximately £10.3 billion, including approximately £9.8 billion in cash and cash equivalents.  These 2019 financial statements were internally inconsistent.  Among other things, although Xcalibur claimed to grow from 238 employees at year-end 2018 to 414 employees at year-end 2019, its wage and salary expenses remained £6 million and its operating costs were exactly £62,094,786 both years. Textron did not respond to the offer.

**Ten Cate Publicly Announces the Fake Tender Offer**

20.      In early November 2020, ten Cate arranged for an advertisement to be placed in The New York Times announcing Xcalibur's tender offer for the common stock of Textron.  On November 4, 2020, Ten Cate contacted The New York Times, seeking online and print advertising for the tender offer announcement.  Ten Cate initially sought to have the advertising campaign begin on November 5, but after exchanging a series of emails with ten Cate concerning logistics, The New York Times agreed to publish the advertisement on November 9, 2020.  Upon The New York Times' request for advanced payment, ten Cate provided an international bank wire receipt indicating payment from a purported Swiss bank account.  However, no such bank account existed. The New York Times was never paid for the advertisement.

[THIS SPACE IS LEFT BLANK INTENTIONALLY]

21.     On Monday, November 9, 2020, The New York Times published the tender offer advertisement on page B3.  Ten Cate was responsible for the information contained in the advertisement.

THE NEW YORK TIMES, MONDAY, NOVEMBER 9, 2020        N        **B3**

**Offer To Purchase For Cash**
**All Outstanding Shares of Common Stock**
of
**TEXTRON INC**
at
**$60.50 NET PER SHARE**
by
**XCALIBUR AEROSPACE LTD.**
a
**Xcalibur Aerospace LLC COMPANY**

**THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 11:59 P.M., NEW YORK CITY TIME, ON FRIDAY, DECEMBER 11, 2020, UNLESS THE OFFER IS EXTENDED.**

Xcalibur Aerospace Ltd., a United Kingdom corporation (the "Purchaser") and a wholly-owned subsidiary of Xcalibur Aerospace LLC, a Delaware Company ("Parent"), is offering to purchase all of the 242,961,000 outstanding shares of common stock with par value $0.125 (the "Shares"), of Textron Inc., a Delaware corporation, operating out of 40, Westminster Street, Providence (RI) ("Textron"), at a purchase price of $60.50 per Share (the "Offer Price"), net to the sellers in cash, without interest thereon and subject to any required withholding taxes, upon the terms and subject to the conditions set forth in this Offer to Purchase and in the related Letter of Transmittal (which, together with the Offer to Purchase, each as may be amended or supplemented from time to time, collectively constitute the "Offer").

The Offer is conditioned upon, among other things, (i) there being validly tendered and not withdrawn before the expiration of the Offer a number of Shares, which, together with the Shares then owned by Parent and its subsidiaries (including the Purchaser), represents at least a majority of the total number of Shares outstanding on a fully diluted basis, (ii) Xcalibur Aerospace's Board of Directors having approved the Offer and the Buy-Out described herein (the "Proposed Buy-Out") such that, or we are otherwise satisfied in our sole discretion that, the restrictions on business combinations with interested shareholders set forth in the General Laws of Delaware and any other applicable anti- takeover laws are inapplicable to the Offer and the Proposed Buy-Out, (iii) the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, applicable to the purchase of Shares under this Offer having expired or been terminated as described herein, and any other approvals or notifications under applicable foreign antitrust, competition or Buy-Out control laws applicable to the purchase of Shares under this Offer having been obtained or made as described herein and (iv) Textron Inc. not having entered into or effectuated any agreement or transaction with any person or entity having the effect of impairing the Purchaser's or Parent's ability to acquire Textron Inc. or otherwise diminishing the expected value to Parent of the acquisition of Textron Inc..

Parent and the Purchaser are seeking to negotiate a business combination with Textron Inc.. Subject to applicable law, Parent and the Purchaser reserve the right to amend the Offer (including amending the number of Shares to be purchased, the Offer Price and the consideration to be offered in the Proposed Buy-Out), including upon entering into a Buy-Out agreement with Textron Inc., or to negotiate a Buy-Out agreement with Textron Inc. not involving a tender offer pursuant to which the Purchaser would terminate the Offer and the Shares would, upon consummation of such Buy-Out, be converted into the consideration negotiated by Parent, the Purchaser and Textron Inc..

Neither this Offer to Purchase nor the Offer constitutes a solicitation of proxies in connection with any potential Proxy Solicitation (as defined in the Offer to Purchase) or otherwise. Any such solicitation will be made only pursuant to separate proxy solicitation materials complying with the requirements of the rules and regulations of the Securities and Exchange Commission.

**SUMMARY TERM SHEET**

*The information contained in this summary term sheet is a summary only and is not meant to be a substitute for the more detailed description and information contained in the Offer to Purchase, the Letter of Transmittal and the Notice of Guaranteed Delivery. You are urged to read carefully the Offer to Purchase, the Letter of Transmittal and the Notice of Guaranteed Delivery in their entirety. Parent and the Purchaser have included cross-references in this summary term sheet to other sections of the Offer to Purchase where you will find more complete descriptions of the topics mentioned below. The information concerning Textron Inc. contained herein and elsewhere in the Offer to Purchase has been taken from or is based upon publicly available documents or records of Textron Inc. on file with the United States Securities and Exchange Commission (the "SEC") or other public sources at the time of the Offer. Parent and the Purchaser have not independently verified the accuracy and completeness of such information. Parent and the Purchaser have no knowledge that would indicate that any statements contained herein relating to Textron Inc. taken from or based upon such documents and records filed with the SEC are untrue or incomplete in any material respect.*

| | |
|---|---|
| Securities Sought: | All of the issued and outstanding 242,961,000 shares of common stock of Textron Inc. Corporation with par value of $0.125 per common share. |
| Price Offered Per Share: | $60.50 in cash, without interest thereon and subject to any required withholding taxes |
| Scheduled Expiration of Offer: | 11:59 p.m., New York City time, on Friday, December 11, 2020, unless the Offer is otherwise extended. See Section 1 – "Terms of the Offer." |
| Purchaser: | Xcalibur Aerospace Ltd., a wholly owned subsidiary of Xcalibur Aerospace LLC, a Delaware LLC Company. |

22.     The advertisement announced Xcalibur's offer to purchase in cash all outstanding shares of Textron's common stock for $60.50 per share, an approximately 56% premium over Textron's closing share price of $38.83 on Friday, November 6, 2020.  The advertisement stated that Xcalibur expected to submit to the Commission its Schedule TO – a filing used to report written communications relating to a tender offer – on November 10, 2020, and that the offer was to expire on December 11, 2020.

23.     The advertisement described Xcalibur as "an aerospace and defence company specializing in the development and manufacturing of high speed unmanned aircraft systems (UCAV)" and its purported parent company, Xcalibur Aerospace LLC ("Xcalibur U.S."), as "a diversified global investment company focusing on A&D opportunities" with "four growth platforms:  emerging defence markets, opportunistic, private equity and foreign exchange contract related export credit." Ten Cate knew or was reckless in not knowing that these claims were false.

24.     Although the advertisement portrayed Xcalibur as a company with the legitimate intention of commencing and consummating the tender offer and with the financial means to complete the offer, it stated that Xcalibur's financial condition was <u>not</u> relevant to shareholders' decision to tender their shares because, among other reasons, (1) the tender offer "is being made for all outstanding Shares solely for cash;" (2) Xcalibur "will have sufficient funds available to purchase all Shares successfully tendered in the Offer;" and (3) "the Offer is not subject to any financing condition."  Ten Cate knew or was reckless in not knowing that these claims were false.

25.     The false statements in the advertisement included that:

- Xcalibur U.S. "entered into a facilities agreement with Investment Banking partners and Members pursuant to which such credit institutions have committed to provide term loan credit facilities to [Xcalibur U.S.] in the aggregate amount of up to $11 billion."

- Xcalibur U.S. "expects, based upon the combination of internally available cash and borrowings under the term loan credit facilities and/or other available committed credit facilities and/or the issue of debt securities in various debt capital markets, to have sufficient cash on hand at the expiration of the Offer to pay the Offer Price for all Shares in the Offer."

26.    Ten Cate made these misrepresentations knowingly or recklessly.  Ten Cate and Xcalibur had no ability to commence the tender offer or consummate their offer to acquire control of Textron.  To do so was impossible given their complete lack of financial resources.

27.    Xcalibur had minimal, if any, operations and assets.  Xcalibur U.S. was not the diversified global investment company with access to billions of dollars in financing described in the advertisement.  Xcalibur U.S. existed solely on paper with no operations or assets.  It was created in 2016 by a friend of ten Cate's merely through the filing of paperwork in Delaware and the opening of a bank account with a $100 deposit.  After ten Cate failed to reimburse the $100, the individual withdrew the money and closed the account.  Further, at the time of the proposed tender offer, Xcalibur U.S.'s corporate status in Delaware had been voided for failure to pay taxes.

28.    The credit facilities and available cash referenced in the advertisement did not exist. Xcalibur lacked the $11 billion in cash it had calculated was necessary to complete the transaction, let alone the $14 billion the transaction in fact required, and would not have been able to complete the tender offer without outside financing, which did not exist.

29.    The advertisement further claimed, contrary to ten Cate and Xcalibur's actual interactions with Textron, that Xcalibur was waiting to "engage in meaningful discussions regarding our proposal" with Textron's Board of Directors and that the Board "has not approved or disapproved the Offer at this time."  The advertisement failed to disclose that Xcalibur had made at least two previous tender offer overtures to Textron and that Textron had resolutely rejected the

10

first and did not respond to the second.

30.     The advertisement directed investors to Xcalibur's website

(www.xcaliburaero.co.uk) and its agents identified on the website for questions.

31.     On the morning of November 9, 2020, Xcalibur's website was updated to include a

webpage titled "TXT TENDER OFFER."  The webpage included the top portion of The New

York Times advertisement announcing the tender offer and directed readers to "Send us an email

to obtain the Term Sheet for the projected Tender Offer."  The webpage also assigned an

unsubstantiated value of $20 billion to a combined Xcalibur and Textron entity.

32.     In connection with the November 2020 advertisement and the phony tender offer, a

New York-based printing and filing company hired by ten Cate provided technical services to

Xcalibur in preparation for filing the Schedule TO.  Ten Cate never paid the company despite

providing multiple excuses for delayed payment and repeated promises that payment was

forthcoming.  When pressed by representatives of the company about the delay, ten Cate assured

them that it would make no sense for Xcalibur to have billions of dollars to buy Textron, but not

$5,000 owed to the printing company.  Eventually, ten Cate falsely asserted that he had transferred

payment.  However, the documentation ten Cate provided to the company as evidence of the wire

transfer confirmation was fabricated, and no transfer was ever made.

**Reaction to Xcalibur's Announcement**

33.     The misrepresentation in Xcalibur's announcement was material to Textron's

investors and prospective investors.  Throughout the day on November 9, 2020, several media

outlets reported on Xcalibur's tender offer.  The trading volume for Textron shares was nearly

450% higher than that of the prior trading day, the price of the stock spiked, and the NYSE

temporarily halted trading of Textron shares.

34.     Textron issued a press release responding to the purported tender offer stating its

belief that "the purported tender offer is fictitious and is being made in violation of U.S. securities laws, including relevant filing and disclosure requirements." The release further stated that "in the past two years Textron has received other purported indications of interest from Xcalibur, and each time Xcalibur has been unable to provide details of its financial wherewithal" and that "[a]s it has done previously, Textron has informed relevant authorities of this most recent fictitious offer."

35.    Later that afternoon, ten Cate directed that a response to Textron's press release be posted on Xcalibur's website criticizing Textron's senior management for not "engag[ing] in earnest" and for "discarding [Xcalibur's previous offer] out of hand, without consideration for their investors." According to Xcalibur's statement, "[t]he response of Textron [] does not surprise us, yet our offer stands and we will defend it in front of the SEC in the days to come."

36.    A number of investors purchased Textron shares during the morning of November 9, 2020, while the share price was artificially inflated, and subsequently sold those shares for a loss after the market corrected upon the news of the fraudulent tender offer.

37.    The Commission's processes prevented the filing of the Schedule TO.

38.    The purported tender offer expired on December 11, 2020, without being extended. Defendant has made no additional offers to Textron.

**Ten Cate's Communications with Commission Staff**

39.    In an interview with the Commission staff following the announcement of the tender offer, ten Cate continued to promote the legitimacy of the tender offer, but in doing so made a number of false and/or implausible claims, including that: (1) Xcalibur currently had 140 employees and most recent EBITDA of $250 million; (2) Xcalibur's financial statements had been audited by an international accounting and auditing firm; and (3) billions of dollars in funds needed for the tender offer were held in escrow in a Swiss bank account. Each of these representations were false.

40.     Despite multiple requests from Commission staff for support for these claims, ten Cate failed to produce any legitimate evidence corroborating these statements.  Xcalibur never had had any meaningful capital, employees, or operations.  Further, the accounting firm named by ten Cate never provided any services to Xcalibur.

41.     One document that ten Cate provided to the SEC purported to be a 2019 capitalization table stating that Xcalibur had secured billions of dollars in funding from a U.S.-based space consulting firm and a Hong Kong-based international banking institution.  The banking institution identified in the table does not exist.  The space consulting firm referenced by ten Cate, while real, did not make any investments in Xcalibur.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

42.     The Commission re-alleges and incorporates by reference the allegations in paragraphs 1-41 inclusive, as if they were fully set forth herein.

43.     Defendant, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

44.     By reason of the foregoing, ten Cate violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§

240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-8 Thereunder

45.     The Commission re-alleges and incorporates by reference the allegations in paragraphs 1-41 inclusive, as if they were fully set forth herein.

46.     Defendant made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in fraudulent, deceptive, or manipulative acts or practices in connection with a tender offer or a solicitation of security holders in favor of an offer, request, or invitation.

47.     On November 9, 2020, ten Cate publicly announced that Xcalibur planned to make a tender offer that had not yet been commenced, and Defendant:

(a)     made the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer; and

(b)     did not have the reasonable belief that Defendant and Xcalibur would have the means to purchase securities to complete the offer.

48.     By reason of the foregoing, ten Cate violated and, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 [17 C.F.R. § 240.14e-8], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

(1)     Permanently restraining and enjoining Defendant from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8

14

thereunder [17 C.F.R. § 240.14e-8];

(2)     Permanently restraining and enjoining Defendant, or any entities he controls, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that he not be prevented from purchasing or selling securities listed on a national securities exchange for his own personal account;

(3)     Ordering Defendant to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

(4)     Prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); and

(5)     Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.


Dated: April 5, 2022

                                        Respectfully submitted,

                                        */s/ Duane K Thompson*
Of Counsel:                             Duane K. Thompson*
Amy L. Friedman                         Edward J. Reilly
Brian Vann                              Securities and Exchange Commission
Securities and Exchange Commission      100 F Street, NE
100 F Street NE                         Washington, D.C. 20549
Washington, D.C. 20549                  Tele: 202/551-7159 (Thompson)
                                        thompsond@sec.gov


*Application for admission *pro hac vi*ce pending